UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NEW LIFE TREATMENT CENTER, INC., <br><br> Plaintiff and Counter-Defendant, <br><br> vs. <br><br> SANFORD HEALTH PLAN, <br><br> Defendant and Counter-Claimant. | 4:24-CV-04058-KES <br><br> ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS |

Plaintiff, New Life Treatment Center, Inc., sued Sanford Health Plan for several state-law contract and tort claims arising under California law. Docket 15. Sanford counterclaimed, alleging four causes of action: intentional misrepresentation, fraudulent concealment, violation of California's Unfair Competition Law (UCL), and intentional interference with contractual relations. Docket 22. New Life now moves to dismiss Sanford's counterclaim, Docket 28, and Sanford opposes the motion, Docket 30. For the following reasons, the court grants in part and denies in part New Life's motion to dismiss.

**FACTUAL BACKGROUND**

The court considers the following allegations taken from Sanford's counterclaim as true for the purposes of ruling on New Life's motion to dismiss. This course is appropriate as to both the Rule 12(b)(6) challenge and the Rule 12(b)(1) challenge, where the latter challenge is "facial."

New Life is a California corporation that provides substance use disorder treatment services and maintains its principal place of business in California. Docket 15 ¶¶ 2, 17. Sanford is a nonprofit corporation that is part of Sanford Health and maintains its principal place of business in South Dakota. *Id.* ¶ 18; Docket 22 ¶ 8.[1]

Sanford provides Affordable Care Act (ACA) exchange plans to service areas in South Dakota, North Dakota, and parts of Iowa and Minnesota. Docket 22 ¶ 2. At issue in this litigation are ten policies that were sold on the state exchange marketplace in South Dakota and North Dakota, including one policy that is funded by Three Affiliated Tribes in North Dakota. *Id.* ¶ 11. New Life commenced this suit contending that Sanford failed to properly reimburse New Life for authorized medical services to Sanford's insureds. Docket 15 ¶ 1. In its counterclaim, Sanford maintains that New Life engaged in a fraudulent scheme by targeting Sanford and vulnerable patients. Docket 22 ¶ 2. According to Sanford, the scheme involves

> [f]inding indigent individuals in need of substance abuse treatment, many of whom already had coverage through Medicaid; [e]nrolling them in more lucrative commercial health insurance policies that often did not require payment of premiums, often by using false information; [e]nticing them, in violation of the law and policy terms, to travel to California for treatment with financial inducements, such as free travel, payment of insurance premiums, and waiver of deductibles and coinsurance; and [r]ecouping cash outlays by billing massive amounts for services to Sanford for as high as $419,000 for just one patient.

*Id.* ¶ 3.

---

[1] Docket 22 contains Sanford's Answer and Counterclaims. *See* Docket 22. When citing to Docket 22, the court is citing to Sanford's counterclaim that starts on page 32 of Docket 22.

Sanford provides health care coverage to its insureds in two ways relevant to this litigation. The first method is through a network of providers—generally referred to as "in-network" or "participating" providers—who have contracted with Sanford to provide services at agreed upon rates. *Id.* ¶ 13. Sanford negotiates contractual rates with these participating providers which helps reduce the overall cost of care and offers the insureds lower premiums and out-of-pocket costs. *Id.* The second method is through providers outside of Sanford's network—generally referred to as "out-of-network" or "nonparticipating" providers. *Id.* ¶ 14. Insureds may elect to treat with nonparticipating providers but must pay more by design. *Id.* ¶ 15.

Under the ACA, insureds generally must enroll during the open enrollment period unless a qualifying life event (QLE) makes them eligible to enter a "special" enrollment period that allows an individual to enroll within 60 days of the event. *Id.* ¶ 20. One such QLE is the loss of minimum essential coverage. *Id.* But enrollees are not eligible under this QLE if they either had no coverage for more than 60 days, were enrolled in other health care coverage, or voluntarily terminated their coverage. *Id.*

The insureds at issue here were enrolled outside of open enrollment and thus required a QLE to enroll during a special enrollment period. *Id.* ¶ 21. Eight of the ten applicants listed loss of minimum essential coverage as the QLE. *Id.* ¶ 20. Sanford alleges New Life falsely represented, or instructed enrollees to falsely represent, that the enrollees lost minimum essential

3

coverage within the last 60 days, thereby making those individuals eligible to enroll under the loss of minimum essential coverage QLE. *Id.* ¶ 21.

In addition, enrollees who purchase exchange plans may qualify for advance payment of federal premium tax credits, which cover most or all of the plan premiums if their modified adjusted gross income is below a certain limit. *Id.* ¶ 22. Sanford maintains, however, that applicants are ineligible for tax credits if they qualify for Medicaid because Medicaid income thresholds are lower than the limit for subsidy eligibility. *Id.* Sanford states that commercial policies like Sanford's typically pay for medically necessary services at higher rates than Medicaid. *Id.* ¶ 23. To take advantage of the higher payments from Sanford rather than Medicaid, Sanford alleges that New Life modified, or instructed enrollees to modify, applicants' incomes so the reported income would exceed the Medicaid threshold but fall below the maximum for subsidy eligibility. *Id.* As a result, the enrollees could qualify for Sanford insurance, which would require little to no premium payments by the enrollees. *Id.* Sanford contends that New Life benefitted by securing more generous reimbursement payments under Sanford's policies than it would have received under Medicaid. *Id.*

Sanford also alleges that New Life instructed enrollees to provide false information to qualify for subsidized policies, including falsifying enrollee addresses. *Id.* ¶¶ 25-27. These targeted patients, Sanford contends, were unemployed and/or homeless, which qualified them for Medicaid and not the subsidized and more expensive commercial policies. *Id.* ¶ 27.

Finally, Sanford maintains that New Life unlawfully promised to waive the enrollees' cost-sharing obligations, such as deductibles and co-insurance payments, and illegally paid for their travel to and from California. *Id.* ¶ 28. New Life targeted these enrollees, according to Sanford, because it knew the enrollees would be unable to satisfy the mandatory out-of-network cost-sharing obligations under the Sanford policies. *Id.* Sanford asserts that New Life's waiver of the enrollees' cost-sharing responsibilities increases the overall cost of healthcare, forcing all Sanford insureds to pay higher premiums. *Id.* ¶ 19. When Sanford attempted to contact New Life about the insureds at issue and the services rendered to them, Sanford asserts that New Life failed to provide reasonable information that it requested, such as treatment records and information concerning New Life's involvement in patient enrollment. *Id.* ¶¶ 5; 82, 83.

In its counterclaim, Sanford provides patient-specific allegations that include when the patient submitted their application, the policy's effective date, and the date indicating when New Life submitted its first claim under such policy. *See id.* at 40-49. The patient-specific allegations include Sanford's attempt to verify the enrollee's home address listed on the enrollment application, *id.* ¶¶ 32, 46, 52, 60, 67, 75, and information concerning New Life's representatives that arranged for certain patients to travel to California for services, *id.* ¶¶ 41, 47, 57, 68. The patient-specific allegations also assert that (1) there is no evidence certain patients lost healthcare coverage within 60 days of enrollment, *id.* ¶¶ 33, 59, 65; (2) the patients should have been

responsible for paying the out-of-pocket deductibles and coinsurance but for New Life's fraudulent incentive of free care for treatment in California, *id.* ¶¶ 35, 53, 61, 69, 80; and (3) the patients were likely eligible to enroll in Medicaid—given the patients' unemployment and homeless status—which should have rendered the patients ineligible for Sanford's subsidized commercial policies, *id.* ¶ 34.

After New Life filed suit, Sanford filed a counterclaim that alleges four causes of action: intentional misrepresentation, fraudulent concealment, violation of California's UCL, and intentional interference with contractual relations. *Id.* at 52-62. As predicates to its UCL claim, Sanford further alleges causes of action under the Eliminating Kickbacks in Recovery Act (EKRA), California's Insurance Anti-Kickback Law (CIAKL), California Penal Code §§ 549 and 550,[2] and SDCL § 58-33-37. *Id.* ¶¶ 113-17. Sanford asserts, and New Life does not dispute, that California law governs all four causes of action in its counterclaim.[3] *Id.* ¶¶ 87, 99, 111, 123. Sanford seeks relief in the form of

---

[2] Sanford also alleges a claim under California Penal Code § 550(a)(1), which is derivative of its claim brought under § 550. Docket 22 ¶ 115.

[3] Sanford is correct. In diversity jurisdiction cases, federal courts apply the choice of law rules of the forum state to determine which state's substantive law controls. *Allianz Ins. Co. of Can. v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006). Thus, South Dakota's choice of law rules apply here. In determining which state's law governs tort claims, South Dakota utilizes the "most significant relationship test." *Burhenn v. Dennis Supply Co.*, 685 N.W.2d 778, 784 (S.D. 2004). This test employs the following factors: "(a) the place where the injury occurred[;] (b) the place where the conduct causing the injury occurred[;] (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties[;] and (d) the place where the relationship . . . between the parties is centered." *Id.*; *see* Restatement (Second) of Conflict of

restitution and injunctive relief under the UCL, money damages, punitive damages, and dismissal of the complaint with prejudice. *Id.* at 63; *id.* ¶ 120. New Life now moves to dismiss all of Sanford's counterclaims based on Sanford's lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Docket 28. In opposing New Life's motion to dismiss, Sanford alternatively asks for leave to amend its counterclaim. Docket 30 at 29. For the reasons set forth below, New Life's motion is granted in part and denied in part.

### DISCUSSION

### I.    Rule 12(b)(1) Subject Matter Jurisdiction

### A. Standard of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for a pre-answer motion to dismiss for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). In deciding on a motion to dismiss under Rule 12(b)(1), a district court "must distinguish between a 'facial attack' and a 'factual attack' on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). When a party mounts a facial challenge to subject matter jurisdiction—that is, when the facts alleged, even if true, are insufficient to establish jurisdiction—"the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought

---

Law § 145 (Am. Law Inst. 1971). Because all four factors favor California, the law of California applies to Sanford's counterclaims.

under Rule 12(b)(6)." *Id.* (internal quotation marks omitted). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Osborn*, 918 F.2d at 729 n.6.

Here, Sanford argues that the court, in considering New Life's motion to dismiss under Rule 12(b)(1), "should presume the facts true as required by Rule 12(b)(6)." Docket 30 at 16. Conversely, New Life states, without explaining, that the court should review evidence beyond the complaint and need not presume the truthfulness of Sanford's allegations. Docket 29 at 3. New Life describes the rule for a factual challenge in its brief, *id.*, but does not expressly commit to one or the other kind of challenge in either its opening brief or reply. *See id.*; Docket 33. Because neither party introduced evidence outside the pleadings, the court will consider New Life's motion to dismiss under 12(b)(1) as a facial attack to subject-matter jurisdiction. Thus, the court will accept the facts alleged in Sanford's counterclaim as true, drawing all reasonable inferences in favor of Sanford. *See Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (describing Rule 12(b)(6) protections).

### B. Article III Standing

New Life's specific challenge to subject-matter jurisdiction is an assertion that Sanford lacks standing to pursue its claim. *See* Docket 29 at 3-6. For a party to establish subject matter jurisdiction, it must "show it has standing to sue." *Quiles v. Union Pac. R.R. Co., Inc.*, 4 F.4th 598, 603 (8th Cir. 2021) (citing *Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.*, 424 F.3d 840, 843

(8th Cir. 2005)). A court "will not reach the merits if [a claimant] does not have standing." *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 708 (8th Cir. 2021). "To establish standing to sue in federal court, a [claimant] 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.' " *McNaught v. Nolen*, 76 F.4th 764, 768-69 (8th Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

The party invoking federal jurisdiction bears the burden of establishing that it has standing. *Spokeo, Inc.*, 578 U.S. at 338. "At the pleadings stage, general factual allegations suffice to support standing[,]" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022), so long as the claimant alleges "sufficient facts to support a reasonable inference that [it] can satisfy the elements of standing." *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021). New Life alleges that Sanford lacks all three standing elements to bring its counterclaims. Docket 29 at 3, 5. The court will consider each element in turn.

To establish an injury in fact, a party must allege "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Carlsen*, 833 F.3d at 908 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In addition, "[a] 'legally protected interest' requires only a 'judicially cognizable interest.' " *Id.* (quoting *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 959 (8th Cir. 2011)). A "particularized" injury "affect[s] the [claimant] in a personal and

individual way." *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). Along with the injury being "particularized," it must also be "concrete." *Id.* A concrete harm is one that actually exists; that is, it must be "real," and not "abstract." *Id.* at 340. The Supreme Court has made it clear that particularization and concreteness require "quite different" analyses and that both are necessary components of the injury in fact inquiry. *Id.* at 339-40.

### 1. Intentional Misrepresentation

Sanford has alleged facts establishing it has suffered an injury in fact that is actual, concrete, and particularized to sustain its intentional misrepresentation claim. Sanford asserts that New Life directed applicants to input a multitude of false information so the applicant would qualify for Sanford healthcare coverage. Docket 22 ¶ 89; *see id.* ¶¶ 28, 31, 40, 45. This includes New Life directing patients to falsify income, addresses, and QLE eligibility requirements. *Id.* ¶ 89; *see id.* ¶¶ 26, 32-33, 59-60, 65-67, 74, 78. As a result, New Life billed Sanford for the eventual services it provided to these insureds at higher reimbursement rates than it would have otherwise received. *Id.* ¶¶ 88, 90; *see id.* ¶¶ 53, 61. Sanford maintains that it suffered a monetary harm totaling over $1 million. *Id.* ¶ 6. These allegations are concrete because the alleged breach has already occurred. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("As *Spokeo* explained, certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a

concrete injury in fact under Article III.”). Sanford's allegations are also particularized because any consequences to Sanford from the alleged fraud have already occurred due to New Life's actions. In addition, Sanford has alleged that it has suffered monetary damages because of New Life's alleged fraud, totaling over $1 million. Thus, Sanford has alleged an “actual” injury. *See Carlsen*, 833 F.3d at 909.

New Life contends that “Sanford does not allege that New Life billed for any illegitimate or unnecessary services—only that New Life's claims arose out of ‘falsified’ applications for insurance by Medicaid-eligible patients.” Docket 29 at 3. New Life further maintains that Sanford has suffered no injury in fact because, even if New Life caused enrollees to misreport their income, “[t]hose patients were already eligible for Sanford's insurance plans, regardless of their income, and Sanford was required to accept their enrollment. [New Life alleges that] Sanford suffers no injury by paying for the legitimate health claims of patients who were legitimately eligible for and enrolled in Sanford health plans.”[4] *Id.* at 5.

---

[4] New Life states that “Sanford's counterclaims make no allegation that Sanford suffered an injury or lost money as a result of any alleged conduct by New Life, including the allegation that New Life recruited patients who applied for Sanford insurance, paid patients' travel expenses pursuant to California Law (Cal. Health & Safety Code § 11831.65(c)(3)), or did not collect patients' coinsurance or deductible payments.” Docket 29 at 6. But this contention is simply untrue. Sanford claims that it suffered an injury specifically stemming from New Life's fraudulent practices of falsifying information while recruiting enrollees. Docket 22 ¶¶ 21, 23, 27. This includes Sanford's allegations that New Life enticed the enrollees with paid travel expenses, *id.* ¶ 28, and that New Life specifically chose to not collect patients' coinsurance or deductible payments, *id.* ¶¶ 28, 35, 53, 69, 80, 88, 101.

New Life's argument is unavailing, however, because it essentially contends that Sanford lacks standing because its claims are not viable. "It is crucial . . . not to conflate Article III's requirement of injury in fact with a [claimant's] potential causes of action, for the concepts are not coextensive." *See ABF*, 645 F.3d at 960 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009)). Whether Sanford suffered only minimal harm is immaterial at this stage of the litigation because the standing inquiry considers only the type of harm, not the extent. *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 959 (8th Cir. 2019) (citing *Spokeo*, 578 U.S. at 341). In other words, a party's standing to assert a claim does not depend on the claim's viability. As stated above, Sanford has pleaded extensive allegations of economic harm. When an alleged harm is "economic," "the 'injury in fact' question is straightforward." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (citation omitted). Due to New Life's alleged fraud, Sanford suffered over $1 million in losses—a cognizable harm about which it pleaded sufficient factual allegations. Thus, Sanford satisfies the injury in fact element of Article III standing.[5]

Sanford next must show that its injury is "fairly traceable to the challenged action of the [opposing party], and not the result of the independent

---

[5] This logic likewise applies to New Life's other arguments that Sanford has not suffered an injury in fact in its memorandum in support of its motion to dismiss and in its reply brief. *See* Docket 29 at 3-5; Docket 33 at 2-5. These arguments go to the viability of Sanford's claims, which, as stated above, is not what the injury in fact analysis commands.

action of some third party not before the court." *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021) (quoting *Lujan*, 504 U.S. at 560). "Traceability . . . requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm. That connection cannot be overly attenuated." *Id.* (cleaned up) (quoting *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)). New Life argues that causation is not met here because "[a]ny alleged income inflation does not cause New Life's patients to become Sanford-insured—they were eligible for Sanford's insurance plans regardless of their income." Docket 29 at 5. But New Life's argument is misplaced. The issue is whether Sanford has sufficiently pleaded facts showing that the alleged fraud can be traced back to New Life's actions. Sanford has made such a showing by alleging that the fraud and attendant damages stem directly from New Life's representatives (or agents) directing the enrollees to make misrepresentations during the enrollment process.[6]

Finally, Sanford seeks an award of damages that would redress its alleged injury. In its counterclaim, Sanford seeks monetary damages in the amount it paid to New Life after New Life submitted claims for services to Sanford insureds based on its alleged fraud. Docket 22 ¶ 95. Sanford's harm is

---

[6] New Life states that the actions are traceable to some third party not before the court, whether it be New Life's patients, the South Dakota legislature, or Congress. Docket 29 at 5. But New Life fails to explain how Sanford's injury arises from the actions of these other parties. Sanford, on the other hand, has sufficiently pleaded how its alleged injury in fact has been caused by New Life's actions. New Life's argument is thus without merit.

therefore likely to be redressed by a favorable judicial decision. Thus, the court holds that Sanford has standing to bring its intentional misrepresentation claim.

### 2. Intentional Interference with Contractual Relations and Fraudulent Concealment

The court similarly concludes that Sanford has standing to pursue its intentional interference and fraudulent concealment claims. *See TransUnion LLC*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross; rather, [claimants] must demonstrate standing for each claim that they press and for each form of relief that they seek."). Sanford's allegation that New Life waived the insureds' out-of-pocket responsibilities to induce them to enroll in treatment at New Life suffices to support standing to assert a claim related to New Life's intentional interference with Sanford's contractual relations. *See Carlsen*, 833 F.3d at 910. Sanford's injury in fact is actual and concrete because the alleged breach has already occurred, and Sanford suffered monetary harm. It is particularized because such interference by New Life caused Sanford monetary harm as a result. Sanford alleges in its counterclaim that such monetary harm is traceable to New Life's waiver of the insureds' out-of-pocket responsibilities. Docket 22 ¶¶ 35, 53, 61, 79, 127-28. And Sanford seeks an award of damages that would redress its alleged injury.

Sanford likewise has standing to pursue its fraudulent concealment claim. Sanford alleges that New Life intentionally concealed (1) its involvement with patients' enrollment applications, Docket 22 ¶ 102; and (2) that it waived its patients' cost-sharing obligations in violation of the terms of Sanford's

insurance policy, *id.* ¶ 101. Because of this concealment by New Life, Sanford contends that it overpaid its reimbursements to New Life and that it provided policies for which the targeted patients would not have otherwise qualified. *Id.* ¶¶ 101-02, 105. These facts adequately allege an injury in fact that is fairly traceable to the challenged acts of New Life and is likely redressable in court.

### 3. California's Unfair Competition Law

Sanford also has standing to bring its claim for restitution under the UCL. The voters of California limited standing under the UCL to those who have "suffered injury in fact and [have] lost money or property as a result of . . . unfair competition." *Zhang v. Superior Court*, 304 P.3d 163, 168 (Cal. 2013) (quoting Cal. Bus. & Prof. Code, § 17204). "Unfair competition" under the UCL is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The California Supreme Court has stated that "a party who has lost money or property generally *has* suffered injury in fact." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 884 (Cal. 2011). "Standing under the UCL requires proof of reliance even if reliance is not an express substantive element of the underlying statute when the claim essentially sounds in misrepresentation." *Swearingen v. Late July Snacks LLC*, 2017 WL 4641896, at *2 (N.D. Cal. Oct. 16, 2017).

Here, Sanford has sufficiently alleged that New Life engaged in fraudulent business acts, as described above, that fall under the UCL's definition of "unfair competition." Sanford suffered money damages over $1

million due to New Life's alleged fraud. And Sanford adequately alleges that it relied on New Life's actions and would not have made such payments to New Life but for its fraudulent practices. Sanford has therefore suffered an injury in fact and has lost money as a result of New Life's alleged fraudulent business acts.[7] Thus, Sanford has standing to pursue its restitution claim under the California UCL.

As for its request for an injunction under the UCL, Sanford has sufficiently alleged that it faces a threat of ongoing or future harm. *See Swearingen*, 2017 WL 4641896, at *3 ("Apart from statutory standing under the UCL, [claimants] must establish Article III standing for injunctive relief."). To establish Article III standing to pursue prospective injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm. *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). The claimant bears the burden "to establish standing by demonstrating that, if unchecked by the litigation, the [opposing party's]

---

[7] The California Supreme Court has explained that, under the UCL, the phrase " '[i]njury in fact' is a legal term of art" that comes from the "requirements for federal standing under [A]rticle III, section 2 of the United States Constitution." *Kwikset Corp*, 51 246 P.3d at 885. To show that they have "lost money or property" under the California UCL, claimants "must demonstrate some form of economic injury," which "is itself a classic form of injury in fact." *Id.* Thus, Sanford has alleged a sufficient injury in fact under the UCL for the same reasons it has alleged an injury in fact sufficient to satisfy Article III standing for its non-UCL claims. *Brown v. Google LLC*, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021) (stating that the " 'economic injury' required by the UCL is a 'classic form of injury in fact' under Article III and there is no precedent which suggests that 'economic injury' has a different meaning in the UCL context than it does in the Article III context.").

allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] "certainly impending." ' " *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 190 (2000)).

Sanford asserts that New Life's actions were part of an elaborate scheme that involved New Life "mak[ing] unlawful promises to patients to waive their out-of-pocket responsibilities, such as deductibles and coinsurance, and offered to, and did, pay for their travel to and from California." Docket 22 ¶ 28; *see id.* ¶¶ 3, 88, 101, 105, 114. Sanford alleges that New Life targeted these insureds because it knew that they "would be unable to satisfy the mandatory cost-sharing obligations." *Id.* Taking these allegations as true, it is plausible that New Life's wrongful behavior will not stop, and Sanford therefore faces a threat of ongoing and future harm. Also, as detailed above, Sanford has adequately alleged that this injury is fairly traceable to New Life's actions and is likely redressable by this court. Thus, Sanford also has standing to bring its claim for an injunction under the UCL.

## II.    Rule 12(b)(6) Failure to State a Claim

### A. Standard of Review

Because Sanford has standing to pursue its counterclaims, the court next turns to New Life's contention that Sanford's counterclaims fail to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). New Life asserts that "Sanford's factual allegations do not allege any plausible claim against New Life under either Rule 8's more lenient standard, or the more exacting particularity standard of Rule 9(b)." Docket 29 at 7. In particular, New Life

maintains that the vast majority of Sanford's allegations are vague or conclusory. *Id.* at 7-8. Sanford disagrees and argues that its counterclaim "has sufficiently alleged detailed facts supporting each of its claims sufficient to meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b)." Docket 30 at 4. Sanford states, however, that Rule 9(b)'s heightened pleading standard does not apply to its UCL and interference with contractual relations claims. *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [claimant has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). The court must accept the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

But when a claimant makes allegations grounded in fraud, Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies. *Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC,* 781 F.3d 1003, 1010 (8th Cir. 2015). Fraud allegations "must state with particularity the circumstances constituting the fraud; although malice, intent, knowledge, and other

18

conditions of a person's mind may be alleged generally." *E-Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012). Stated differently, a fraud claim must specify the "who, what, when, where and how surrounding the alleged fraud . . . and what was obtained as a result." *Quintero Cmty. Ass'n Inc. v. F.D.I.C.*, 792 F.3d 1002, 1010 (8th Cir. 2015) (citations omitted). Rule 9(b) applies equally to both statutory and common law fraud claims. *See E-Shops Corp.*, 678 F.3d at 665 (statutory); *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010) (common law).

In its counterclaim, Sanford asserts four causes of action. The court will address the plausibility of each claim as alleged below.

### 1. Intentional Misrepresentation and Fraudulent Concealment

Under California law, intentional misrepresentation and fraudulent concealment are variations on the same theme. *See Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 917 (Cal. 1997); *see also Hernandez v. Ecolab, Inc.*, 2023 WL 3984815, at *28 (D. Minn. June 13, 2023) (stating that "California law subsumes fraudulent concealment within the framework of intentional misrepresentation").

The elements of an intentional misrepresentation claim under California law are "(1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 910-11 (E.D. Cal. 2020) (emphasis omitted). The elements of fraudulent concealment under California law are: "(1) concealment or suppression of a material fact; (2) by a defendant

with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." *Morroquin v. Pfizer, Inc.*, 367 F. Supp. 3d 1152, 1166 (E.D. Cal. 2019) (quoting *Hambrick v. Healthcare Partners Med. Grp., Inc.*, 238 Cal. App. 4th 124, 162 (2015)). Because both claims sound in fraud, both will be assessed under the pleading requirements of Rule 9(b). *Id.* (collecting cases applying Rule 9(b) to both intentional misrepresentation and fraudulent concealment claims).

New Life argues that because Sanford states in its counterclaim that some assertions are based "on information and belief," Sanford fails to adequately allege fraud to satisfy Rule 9(b). Docket 29 at 8. Sanford maintains that because "the facts constituting the fraud are solely within [New Life's] knowledge or possession[,]" Rule 9(b)'s particularity requirement may be relaxed. Docket 30 at 21 (citing *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 856 (C.D. Cal. 2004).

Here, Sanford has articulated facts necessary to satisfy the heightened pleading standard of Rule 9(b). An important purpose of Rule 9(b)'s particularity requirement is to put the opposing party on notice of allegations of fraud and to ensure that it may promptly respond to specific allegations of such fraudulent conduct. *See* 5A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 1296 (3d ed. 2004). That

purpose is met here. Sanford alleges that New Life (the who) instructed patients over the phone (the where) to falsify their income, their addresses, and QLE eligibility requirements (the what).[8] Docket 22 ¶ 89; *see id.* ¶¶ 26, 32-33, 59-60, 65-67, 74, 78. According to Sanford, New Life knew these misrepresentations were false and intended to induce Sanford to issue policies to the targeted patients. *Id.* ¶¶ 90-91. Sanford explains that it relied on those material misrepresentations and paid inflated claims submitted by New Life that it would not have paid but for the false representations (the how). *Id.* ¶ 91. When it reached out to New Life asking for additional information, Sanford maintains that New Life failed to respond even though it had a duty to provide accurate information. *Id.* ¶¶ 82-84, 103. Sanford alleges $1 million in damages because of New Life's conduct (what was obtained as a result of the misrepresentation). *Id.* ¶ 85. Thus, Sanford has plausibly alleged all of the

---

[8] Sanford alternatively alleges that New Life acted recklessly and without regard to the truth concerning the enrollee's eligibility information. Docket 22 ¶ 90. Sanford states that New Life should have known that those who were eligible for Medicaid could not possess the income provided on their enrollment applications. *Id.* Sanford says that New Life also should have known that the addresses provided were false. *Id.* Importantly, this also suffices as evidence of misrepresentation. *See Engalla*, 938 P.2d at 917 ("[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered."). In addition, Sanford is not required to show that New Life made a misrepresentation directly to Sanford, so long as Sanford can show it acted in justifiable reliance on the misrepresentation. *See Varwig v. Anderson-Behel Porsche/Audi, Inc.*, 74 Cal. App. 3d 578, 581 (1977) (stating a party that makes a fraudulent misrepresentation is subject to liability even where the misrepresentation is not made directly to the claimant, but "to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct").

elements in both its intentional misrepresentation and fraudulent concealment claims.

New Life's argument that Sanford's claims fail because it makes some allegations based "on information and belief" is without merit. Although Sanford bases some allegations on information and belief, "Rule 9(b) is deemed satisfied if the allegations [based on information and belief] are accompanied by a statement of facts on which the belief is founded." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th Cir. 2009). Sanford has plausibly alleged such statements of fact in its counterclaim. This is hardly the fishing expedition that New Life contends it to be. *See* Docket 33 at 7. Thus, "[c]onsistent with . . . Rule 9(b)'s purpose of facilitating a [claimant's] response to and preparation of a defense to charges of fraud," Sanford has adequately apprised New Life of the facts upon which these two claims are based. *Com. Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 646 (8th Cir. 1995). New Life's motion to dismiss Sanford's intentional misrepresentation and fraudulent concealment claims is denied.

### 2. Intentional Interference with Contractual Relations

Sanford also claims that New Life intentionally interfered with its contractual relations—to the extent the contracts are not subject to rescission—"by providing free travel and then waiving the insureds' out-of-pocket responsibilities in order to induce them to enroll" in an out-of-network treatment facility. Docket 30 at 28. New Life contends that Sanford's claim is inadequately pleaded because "[n]othing prohibits New Life from providing

transportation services to its patients [and] waiving some patients' cost-sharing obligations under certain circumstances." Docket 33 at 8. To support this contention, New Life cites to SDCL §§ 58-17-58, 58-17-60, and 18 U.S.C. § 220(b)(5). *Id.*

Under California law, a claim for intentional interference with contractual relations requires a plaintiff to allege: "(1) the existence of a valid contract between the [claimant] and a third party; (2) the [other party's] knowledge of that contract; (3) the [other party's] intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Norman v. Ross*, 101 Cal. App. 5th 617, 668 (2024) (quoting *Reeves v. Hanlon*, 95 P.3d 513, 517 (Cal. 2004)). Because this claim is not based in fraud, the factual allegations will be analyzed under the general pleading standards of Rule 8.

Sanford has plausibly alleged a claim for intentional interference with contractual relations because the counterclaim asserts the necessary elements for this claim. Sanford states that it had "valid and contractually binding insurance policies with its insureds, to the extent the policies were not fraudulently obtained[,]" in which they "were obligated to pay deductibles and coinsurance for services rendered by out-of-network providers." Docket 22 ¶ 124. Sanford alleges that New Life was aware of such contracts and interfered with the contractual relationship by waiving all of these insureds' out-of-pocket responsibilities. *Id.* ¶¶ 125-26. Sanford further asserts that the

insureds "sought and/or received more expensive treatment and other services that they would not have received, or would have received at lower cost to Sanford . . . had the insureds been required to pay out-of-pocket costs required by their insurance policies." *Id.* ¶ 128. As a result, Sanford claims that it paid more for "services, and/or more for each service, than it would have paid if New Life had not intentionally interfered with Sanford's contractual relationships with its insureds." *Id.* Thus, the allegations are made with adequate specificity to provide New Life with sufficient notice of the claim against it.

### 3. California's UCL

California's UCL creates an independent cause of action stemming from business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200. Each "prong" of the UCL provides a "separate and distinct theory of liability," *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007), and a business practice can "violate any or all of the three prongs." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007). The UCL "provides only for equitable remedies." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022), *cert. denied sub nom. Polaris Indus. Inc. v. Albright*, 143 S. Ct. 2612 (2023). In general, a party seeking equitable relief must first demonstrate that its remedy at law is inadequate. *See, e.g., State of Ga. v. Brailsford*, 2 U.S. 402, 408 (1792) ("[S]uits in equity shall not be sustained . . . in any case where plain, adequate, and complete remedy may be had at law."); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60,

75-76 (1992) ("[I]t is axiomatic that a court should determine the adequacy of a remedy in law before resorting to equitable relief.").

Here, Sanford generally alleges causes of action under all three prongs. Docket 22 ¶¶ 112, 120-21. The extent of Sanford's allegation under each prong of the UCL states that "New Life's wrongful conduct, as alleged in this Counterclaim, constitutes unlawful, unfair, and fraudulent business acts and practices." *Id.* ¶ 112. Sanford seeks equitable relief in the form of restitution and an injunction under the UCL. *Id.* ¶¶ 120-21.

But Sanford has failed to sufficiently allege that it lacks an adequate remedy at law to sustain its UCL claim. The Ninth Circuit Court of Appeals, in *Sonner v. Premier Nutrition Corp.*, recently held that "a federal court must apply traditional equitable principles before awarding restitution under the UCL . . . [because it has been] a fundamental principle for well over a century that state law cannot expand or limit a federal court's equitable authority." 971 F.3d 834, 841 (9th Cir. 2020). There, the plaintiff brought a damages claim and an equitable claim for restitution. *Id.* at 839. In the plaintiff's attempt to present her claims to the court instead of a jury, she dropped her damages claim shortly before trial. *Id.* at 838. The district court then dismissed the equitable claims under California's inadequate-remedy-at-law doctrine. *Id.* The Ninth Circuit affirmed on appeal, holding that a party must establish that it "lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL." *Id.* at 844. The Ninth Circuit applied the holding from *Sonner*

two years later in *Guzman v. Polaris Industries Inc.*, 49 F.4th 1308, 1312 (9th Cir. 2022).

Although this court sits in the Eighth Circuit, the Supreme Court precedent that the Ninth Circuit relied upon in *Sonner* compels the same conclusion here. *See Sonner*, 971 F.3d at 839-41; *accord United States v. Bame*, 721 F.3d 1025, 1031 (8th Cir. 2013) ("District courts routinely dismiss unjust enrichment claims where the plaintiff pleaded and pursued both equitable and legal claims simultaneously, as well as where the plaintiff failed to pursue adequate legal remedies.").

Sanford states in its counterclaim the conclusory allegation that it lacks "an adequate remedy at law." Docket 22 ¶ 120. But it provides no justification or reason as to why the over $1 million in monetary damages it seeks is not an adequate remedy. Sanford requests equitable relief in the form of restitution and an injunction. *Id.* ¶¶ 120-21. And even though the *Sonner* court ultimately held that federal courts must apply traditional equitable principles before awarding *restitution* under the UCL, the logic employed there persuades this court to conclude that *Sonner* also applies to other forms of equitable relief, like an injunction. *See Sonner*, 971 F.3d at 843-44 (explaining that equitable jurisdiction can only exist under federal common law if the claimant has no adequate legal remedy); *see also Shay v. Apple Inc.*, 2021 WL 1733385, at *3 (S.D. Cal. May 3, 2021) (collecting cases holding that "district courts have held that the 'adequate remedy at law' requirement applies to equitable relief, which includes injunctive relief claims"). Because Sanford has failed to describe how

it lacks an adequate remedy at law, its claims for restitution and an injunction under the UCL cannot survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Indeed, Sanford alleges that it has suffered "substantial pecuniary losses and irreparable injury . . . [including] monetary harm" due to New Life's fraud, Docket 22 ¶¶ 120-21—a form of harm for which legal damages is an adequate remedy.

Other federal courts have similarly held that, for a UCL claim to survive a motion to dismiss, the claimant must sufficiently plead lack of an adequate remedy at law. *See, e.g., Shay*, 2021 WL 1733385, at *4 ("[T]he Ninth Circuit pointed out [in *Sonner*] that the operative complaint did not allege that the plaintiff lacked an adequate legal remedy. This suggests that a plaintiff must plead inadequate legal remedies in the operative pleading to allege claims for equitable relief under the UCL and CLRA.") (internal citation omitted); *Lisner v. Sparc Grp. LLC*, 2021 WL 6284158, at *8 (C.D. Cal. Dec. 29, 2021) (collecting cases holding "that *Sonner*'s reasoning applies at the pleading stage"). "While the availability of monetary damages does not necessarily preclude the availability of equitable relief under the UCL, [claimants] must still plausibly allege that there is no adequate legal remedy." *Klaehn v. Cali Bamboo*, LLC, 2020 WL 3971518, at *9 (S.D. Cal. July 13, 2020); *see also Easton v. Wells Fargo & Co.*, 2022 WL 17886002, at *3 (C.D. Cal. Dec. 6, 2022) ("[A] plaintiff must 'allege some facts suggesting that damages are insufficient to make them whole' when seeking equitable relief.") (quoting *Franckowiak v. Scenario*

27

*Cockram USA, Inc.*, 2020 WL 9071697, at *3 (C.D. Cal. Nov. 30, 2020)). Sanford has failed to satisfy this minimal burden and thus cannot pursue equitable relief under the UCL.

The court's holding remains unchanged even if Sanford's UCL claims are pleaded in the alternative to its other claims for legal damages, should those legal remedies be unsuccessful. "The issue is not whether a pleading may seek distinct forms of relief in the alternative, but rather whether a prayer for equitable relief *states a claim* if the pleading does not demonstrate the inadequacy of a legal remedy. On that point, *Sonner* holds that it does not." *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 907 (N.D. Cal. 2021) (emphasis added); *see also Shay*, 2021 WL 1733385, at *5 (finding plaintiff's argument unavailing to seek equitable claims in the alternative). Because Sanford's pleading fails to state a plausible claim that it lacks an adequate remedy at law, the court grants New Life's motion to dismiss Sanford's claims for restitution and injunctive relief under the UCL without prejudice for lack of equitable jurisdiction.

## III.    Leave to Amend

Federal Rule of Civil Procedure 15 states that, when a responsive pleading has already been served, "a party may amend its pleading only with the opposing party's consent or the court's leave[,]" and leave shall be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). But claimants do not enjoy "an absolute or automatic right to amend" a deficient pleading. *United States ex rel. Lee v. Fairview Health Sys.*, 413 F.3d 748, 749 (8th Cir. 2005). It

is appropriate for a district court to deny leave to amend "where there are compelling reasons 'such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment.' " *Hammer v. City of Osage Beach*, 318 F.3d 832, 844 (8th Cir. 2003) (quoting *Becker v. Univ. of Nebraska*, 191 F.3d 904, 907-08 (8th Cir. 1999)). Under Local Rule 15.1, "any party moving to amend a pleading must attach a copy of the proposed amended pleading to its motion to amend with the proposed changes highlighted or underlined so that they may be easily identified." D.S.D. L.R. 15.1.

Sanford did not file a motion requesting leave to amend. Rather, Sanford's Memorandum in Opposition states in a concluding paragraph that if this court should grant New Life's motion to dismiss, then it seeks leave to amend. Docket 30 at 29. Sanford also fails to describe the amendments it would submit if permitted to amend. *Id.* Because Sanford has not filed a motion to amend its counterclaim, the court will not grant it leave to amend at this time. Although Sanford fleetingly mentions the court should provide it leave to amend, the court is well within its discretion to deny informal requests for leave to amend stated in opposition to a motion to dismiss. *See U.S. ex. rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822-23 (8th Cir. 2009). Sanford is therefore denied leave to amend its counterclaim at this time.

## CONCLUSION

For the foregoing reasons, the court grants in part and denies in part New Life's motion to dismiss. Thus, it is

ORDERED that New Life's Motion to Dismiss (Docket 28) is granted without prejudice for lack of equitable jurisdiction as to Sanford's UCL claim in Count III of its counterclaim. The motion to dismiss is denied as to Counts I, II, and IV for intentional misrepresentation, fraudulent concealment, and intentional interference with contractual relations. Leave to amend the counterclaim is denied at this time.

Dated December 20, 2024.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE